**In re PEACOCK FOOD MARKETS, Inc.**

**TATLE v. SCHMIDT.**

**No. 6874.**

Circuit Court of Appeals, Seventh Circuit.
Nov. 8, 1939.

Rehearing Denied Dec. 20, 1939.

Herman A. Mosher, of Milwaukee, Wis., for appellant.

Reginald I. Kenney, of Milwaukee, Wis., for appellee.

Before EVANS, SPARKS, and TREANOR, Circuit Judges.

TREANOR, Circuit Judge.

This appeal is from the order of the District Court for the Eastern District of Wisconsin, affirming the findings and order of the Referee in Bankruptcy. The Referee found, and entered an order in conformance thereto, that the claim of the creditor, Tatle, appellant here, was not entitled to be classified as a secured claim. Prior to bankruptcy the Peacock Food Markets, Inc., had executed and delivered to claimant Tatle a chattel mortgage upon the corporation's furniture, fixtures and equipment located in a number of different retail food markets, the purpose of the execution of the mortgage being to secure obligations of the corporation evidenced by promissory notes payable to Tatle.

The Referee in Bankruptcy concluded that the chattel mortgage was given and received with intent to hinder, delay and defraud creditors and was void from its inception; and, also, that the chattel mortgage was given in violation of the Wisconsin Bulk Sales Law (St.Wis.1937, § 241.18) and was void as to then existing creditors of the bankrupt.

The correctness of the Referee's findings upon which he based his conclusions of law can be appraised only by considering certain evidence, especially the evidence bearing upon the relationship between the bankrupt, Peacock Food Markets, Inc., and Wisconsin Wholesale Markets, and the personal and business relations of John Carroll, president of the bankrupt, and claimant, Harry R. Tatle.

The following findings are essential to the decision of the Referee:

"That at the time of the delivery of said chattel mortgage said Bankrupt was insolvent, and that said Claimant knew or had reasonable cause to believe that said Bankrupt was then insolvent and that said Bankrupt continued to be insolvent from such date, and was insolvent when it filed its petition for reorganization pursuant to Section 77B of the Bankruptcy Act."

"That said mortgage was given by the Bankrupt, and received by the Claimant

with actual intent to hinder, delay and defraud Creditors of the Bankrupt, and the effect of such conveyance was to hinder, delay and defraud creditors of such Bankrupt."

Trustee-appellee recognizes that the chattel mortgage in question was valid unless there was an actual intent thereby to hinder, delay and defraud creditors; but the trustee insists that the evidence was sufficient to support the findings of the Referee necessary to support the conclusion that the mortgage was given with the intention to hinder, delay and defraud creditors. There is no one item of evidence which directly and conclusively establishes that the conveyance was made and received with fraudulent intent. The existence of the fraudulent intent must be inferred from the acts and conduct of interested parties.

In 1935 Tatle and Carroll were associated as two of the three owners of the stock of Wisconsin Wholesale Markets, which corporation owned the capital stock of Peacock Markets. This latter organization was engaged in the retail meat business. Carroll purchased the fixtures and equipment of the Peacock Markets, such fixtures and equipment representing substantially all of the property of Peacock Markets, and thereupon organized Peacock Food Markets, Inc., which succeeded to the ownership of the property and business of Peacock Markets. Carroll executed a conditional sales contract to Wisconsin Wholesale Markets by the terms of which he promised to pay $20,000, evidenced by a series of promissory notes in the sum of $150 each, one note to be discharged by payment each week; and as additional consideration Carroll relinquished his stock interest in the Wisconsin Wholesale Markets. Later Tatle surrendered his stock in the Wisconsin Wholesale markets and received in exchange a substantial interest in the conditional sales contract which had been executed by Peacock Food Markets, Inc., Carroll's corporation. When Tatle became entitled to the balance of the amount payable under the conditional sales contract he relinquished his rights under the contract, discharged the contract, and took the company's notes for $11,000, but insisted that Carroll and his wife become comakers on a series of 110 judgment notes for $100 each. It was understood that the extinction of the conditional sales contract was for the purpose of improving the financial statement of Peacock Food Markets, Inc., and to strengthen its credit.

During the year 1936 the debtor corporation lost over $15,000 and by March 8, 1936, overdue weekly notes amounted to the sum of $2,000, and Tatle, who had been unable to collect the overdue notes, was threatening to take judgment against the debtor corporation. Carroll was faced by the necessity of permitting Tatle to take judgment on the notes in the total sum of $9,800 or, in the alternative, of causing his corporation to execute a chattel mortgage as security for the payment of the notes. At that moment the corporation had additional indebtedness in the sum of $20,000. Carroll testified that Tatle said that unless he was given some sort of security in the form of a chattel mortgage "or some other affair" he would foreclose and that Carroll would lose whatever he had in the business. It is clear from the foregoing testimony that Tatle knew that the debtor was unable to pay the sum of $2,000 and that it could not meet a judgment against it of approximately $10,000 and continue in business. Mr. Carroll testified that after the chattel mortgage was given to Mr. Tatle the company had no assets on which it could acquire working capital. It is evident from the testimony of Mr. Carroll that he realized that his business could not survive if judgment were taken against him by Tatle. It is obvious, in view of the existence of other creditors holding claims in the amount of $20,000, that any action by Tatle to reduce his notes to judgment and to execute upon the property of Peacock Food Markets, Inc., would result in action by other creditors to protect their interests. Tatle denies knowledge of the actual financial condition of Peacock Food Markets, Inc., at the time of taking of the mortgage, although it is evident that he must have had a very definite impression that the unsecured obligation of Peacock Food Markets, Inc., was not safe. The execution of the chattel mortgage and its acceptance by Tatle put Tatle in the strategic position of being able to exhaust by summary action substantially all the property of the debtor and thus satisfying his claim without recourse to the personal liability of Carroll and wife, and Carroll and wife were, for all practical purposes, relieved of obligation to respond on the notes.

Carroll testified that he had not given Tatle any financial statements of Peacock Food Markets, Inc., but Carroll also tes-

tified that he told Tatle business was bad when Tatle came around to obtain payment on notes which were due and which Carroll could not meet. Carroll testified in part as follows: "I did not attempt to deceive Mr. Tatle as to the standing of the company's business. Mr. Tatle in my estimation is a very conservative individual. He wanted ample protection. I don't know that he knew that I lost $15,000.00 in 1936. He may have asked whether we lost money in 1936. If he did ask, I told him we lost. He was in the meat business in 1936 and 1937, in the Wisconsin Wholesale Markets selling wholesale to hospitals and restaurants."

Appellee places special emphasis upon the letter of March 15, 1937, which was written by Tatle to Carroll and reads as follows:

"Dear Jack:

"Please do not misinterpret my motive in asking for the mortgage. This would act as a protection for you as well as for me.

"I want you to know that should any unforseen event cause me to have to act to take any interest in your Peacock Markets I would do so entirely in both our interests. That is all I want or would get would be the balance due me on the unpaid portion of the notes. The rest of the concern or corporation would be yours entirely to do with as you deem fit.

"I will never take any action unless you specifically tell me to do so. And then only in both our interests—such as partners, my portion to be limited to the unpaid balance due me, when that is paid the stores revert in ownership to you in its entirety.

"I hope this will clear your mind of any doubts you may have had.

"Sincerely,        Harry R. Tatle.

"P. S. Will you please see that your attorney gets in touch with Mr. Mosher now and we get this taken care of before Don leaves. Thank you."

The foregoing letter was written at the time that Tatle was insisting on receiving the chattel mortgage unless the overdue notes were paid. Appellee insists that the letter strongly indicates a vicious agreement between Tatle and Carrol for concerted action in order that Tatle "when specifically told to do so by Carroll could seize the equipment, and then sell the same on a 'forced sale' basis thus acquiring the same for their benefit." And appellee further urges that the agreement "put a premium on Carroll as president of the bankrupt corporation to 'sell out' his corporation" for Carroll's and Tatle's benefit through the device of a forced sale which probably would result in the property going to Tatle and Carroll. Appellee stresses the language of the letter which indicates that Tatle, in case he should seize the property under the terms of the chattel mortgage, would treat it as partnership property, Tatle's interest to be limited to the portion necessary to pay the balance due him, the rest of the property "to revert in ownership to you (Carroll) in its entirety." Claimant-appellant urges that such an interpretation of the letter is unjustified by the language. But it is clear from the letter that Tatle contemplated that the chattel mortgage would be utilized for the benefit of himself and Carroll, and clearly the Referee was justified in inferring that Tatle intended to utilize the chattel mortgage arrangement to subject substantially all of the assets of the debtor corporation to the satisfaction of his own claim with a resulting exclusion of claims of other creditors of the debtor. In reality the only practical result of the execution of the chattel mortgage was to safeguard the interest of Tatle as against other creditors and to give to Peacock Food Markets an extension of time for the payment of the overdue $2,000. But the latter is not unqualified since by the terms of the chattel mortgage failure of the mortgagor to make any $100 payment when due entitled the mortgagee to seize the mortgaged property and to sell and dispose of the same at private or public sale to satisfy the debt of $9,800. It is true that the mortgagee, by written agreement, was obligated to "first consult with and advise said John Carroll" of his intent to exercise any right under the chattel mortgage before actually exercising it. But he did not obligate himself to withhold action for any definite time or to in any way condition his action other than by giving notice of its imminency.

The foregoing provision is in conflict with the declaration of Tatle in the letter of March 15, 1937, that he would never take any action unless Carroll specifically told him to do so. Also, there is no provision in the chattel mortgage or in the written agreement of even date with the execution of the mortgage that recognizes the assurance of Tatle given in the letter of March 15 that any action taken would be only in the interest of himself and Car-

roll, ("such as partners") and that Tatle would insist upon appropriating only such portion of the property as would compensate him for the unpaid balance.

The evidence sustains the finding of the Referee that Peacock Food Markets was insolvent at the time of the execution of the chattel mortgage; that it had been in a precarious financial condition for two years preceding that time and that during the year previous to the execution of the mortgage it had suffered a business loss of $15,000. At the date of the execution of the mortgage the obligations of the debtor were about $30,000. The Referee found that its property had a face value not to exceed $15,000.

The foregoing facts are important in determining the actual value of the consideration exchanged by the parties in connection with the execution of the chattel mortgage. Undoubtedly it was an advantage to the debtor for Tatle to forbear taking judgment on the overdue notes. But in reality Tatle forbore to take action, which, of certainty, would have precipitated action by other creditors with the result that approximately $30,000 of claims would have participated in the distribution of the assets of the insolvent debtor, and in lieu thereof obtained what was intended to be the right to satisfy his entire claim from the assets of the debtor to the exclusion of any other creditor.

We are of the opinion that the Referee reasonably could have concluded that Tatle had sufficient knowledge of the financial condition of Peacock Food Markets, Inc., at the time of the execution of the chattel mortgage to be charged with knowledge of the insolvency of the corporation and further to be charged with knowledge that the execution of the chattel mortgage would subject to the payment of his debt substantially all of the assets of the debtor corporation to the exclusion of other creditors. When the letter of March 15, 1937 is read in the light of the foregoing it reasonably can be construed as indicating an intention on the part of Tatle to exercise his rights under the chattel mortgage for the benefit of himself and Carroll as against the corporation and creditors.

We believe there was substantial evidence to support the finding that the mortgage was given by the bankrupt and received by the claimant to actually hinder, delay and defraud creditors of the bankrupt, and that the effect of such conveyance was to hinder, delay and defraud creditors of the bankrupt.

We recognize, as urged by claimant-appellant, that all of the acts which were done might have been done in good faith with no thought or intention of defrauding creditors; also we recognize that the existence of insolvency at the time of the execution of the chattel mortgage would not be material, even though a preference was intended and actually resulted, provided that the transaction was carried out in good faith for the purpose of enabling the debtor to continue in business. The Supreme Court has pointed out that an intent to prefer and an intent to defraud "are not of the same quality, either in conscience or in law, and one may exist without the other"; but in connection with the foregoing expression the Supreme Court also made the following statement: "There is no necessary connection between the intent to defraud and that to prefer, but inasmuch as one of the common incidents of a fraudulent conveyance is the purpose on the part of the grantor to apply the proceeds in such manner as to prefer his family or business connections, the existence of such intent to prefer is an important matter to be considered in determining whether there was also one to defraud."[1] Also, the Supreme Court has pointed out that the giving of a mortgage and its effect upon other creditors constitute an item of evidence to be considered in determining the question of fraud.[2]

Since we conclude that there was substantial evidence to support the findings of the Referee, it is not necessary to consider whether the execution of a chattel mortgage under the circumstances constituted a fraudulent conveyance under the Wisconsin Bulk Sales Law. We hold that the District Court did not err in affirming the findings of the Referee in Bankruptcy and the order of the District Court is

Affirmed.

[1] Van Iderstine v. National Discount Co., 227 U.S. 575, 582, 33 S.Ct. 343, 345, 57 L.Ed. 652.

[2] Coder v. Arts, 213 U.S. 223, 244, 29 S.Ct. 436, 53 L.Ed. 772, 16 Ann.Cas. 1008; Dean v. Davis, 242 U.S. 438, 446, 37 S.Ct. 130, 61 L.Ed. 419.